UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/25/2018

Alpha Capital Anstalt,

                              Plaintiff,

              -against-

Real Goods Solar, Inc. et al.,

                              Defendants.

1:17-cv-01186 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, United States Magistrate Judge:**

Plaintiff Alpha Capital Anstalt ("Plaintiff" or "Alpha Capital") moves for summary judgment as to the liability of Defendant Real Goods Solar, Inc. ("RGS") for breach of contract. (ECF Nos. 55-58.) RGS moves for summary judgment dismissing all of Plaintiff's claims against RGS. (ECF Nos. 59-62.) Defendant Roth Capital Partners, LLC ("Roth Capital") moves for summary judgment dismissing all of Plaintiff's claims against Roth Capital. (ECF Nos. 63-64.) For the following reasons, the Court DENIES Plaintiff's motion in its entirety, GRANTS RGS's motion in part and DENIES it in part, and GRANTS Roth Capital's motion in its entirety.

<u>RELEVANT FACTS</u>

This action relates to an investment made by Alpha Capital in a public offering by RGS. Defendants are RGS and Roth Capital, which acted as placement agent for RGS in connection with the offering. (*See* Am. Compl., ECF No. 29, ¶¶ 12, 19.)

On February 1, 2017, RGS entered into a Securities Purchase Agreement (the "SPA"), dated as of February 1, 2017, with fifteen institutional and accredited investors (the "First Offering"). (Pl. 56.1 Stmt., ECF No. 57, ¶ 6; RGS Counter 56.1 Stmt., ECF No. 72, ¶ 6.) Pursuant to

the SPA, Alpha Capital invested approximately $1.1 million to purchase RGS Securities in the First

Offering. (Pl. 56.1 Stmt. ¶ 7; RGS Counter 56.1 Stmt. ¶ 7.) On February 6, 2017, Alpha Capital,

along with fourteen other institutional investors, closed on the purchase of units of RGS securities

issued in the First Offering. (Pl. 56.1 Stmt. ¶ 8; RGS Counter 56.1 Stmt. ¶ 8.)

The SPA contains certain provisions relevant to the pending motions, as follows:

Section 4.13(a) [hereinafter referred to as the "90-Day Prohibition"] provides: "From the

date hereof until 90 calendar days after the Closing Date, neither the Company [RGS] nor any

Subsidiary shall issue, enter into any agreement to issue or announce the issuance or proposed

issuance of any shares of Common Stock or Common Stock Equivalents." (Hoffner Decl. Ex. C, ECF

No. 56-3, at 26.)[1]

Section 4.14 [hereinafter referred to as the "Equal Treatment Provision"] provides in

relevant part:

> No consideration (including any modification of any Transaction Document) shall
> be offered or paid to any Person to amend or consent to a waiver or modification
> of any provision of the Transaction Documents unless the same consideration is
> also offered to all of the parties to such Transaction Documents. . . .

(*Id.* at 28.)

Section 5.5 [which, as set forth below, includes both the "50.1% Requirement" and the

"Disproportionate Impact Provisions"] provides in relevant part:

> No provision of this Agreement may be waived, modified, supplemented or
> amended except in a written instrument signed by the Company [RGS] and
> Purchasers which purchased (or prior to the Closing Date, agreed to purchase) at
> least 50.1% in interest of the Shares based on the initial Subscription Amounts
> hereunder [the "50.1% Requirement"], provided that if any amendment,
> modification or waiver disproportionately and adversely impacts a Purchaser (or

---

[1] The SPA is annexed as Exhibit C to the Hoffner Declaration (ECF No. 56), but is split into two parts, *i.e.,*
ECF Nos. 56-3 and 56-4.

group of Purchasers), the consent of such disproportionately impacted Purchaser (or group of Purchasers) shall also be required. . . . Any proposed amendment or waiver that disproportionately, materially and adversely affects the rights and obligations of any Purchaser relative to the comparable rights and obligations of the other Purchasers shall require the prior written consent of such adversely affected Purchaser. [the "Disproportionate Impact Provisions"]. . .

(*Id.* at 29.)

The securities purchased pursuant to the SPA as part of the First Offering included both shares of common stock and Series L Warrants. For example, Alpha Capital purchased 145,162 shares of common stock and 209,838 warrants. (Hoffner Decl. Ex. C, ECF No. 56-4, at 6.) The SPA defines "Shares" as "the shares of Common Stock issuable to each Purchaser pursuant to this Agreement." (Hoffner Decl. Ex. C, ECF No. 56-3, at 4.) The SPA defines "Warrant Shares" as "the shares of Common Stock issuable upon exercise of the Warrants." (*Id.* at 5.)

On the morning of February 7, 2017, Roth Capital contacted RGS and advised that the day's trading provided RGS with the opportunity to raise additional funds through a second offering in the form of an "Intraday trade" (the "Second Offering"). (Pl. 56.1 Stmt. ¶ 13; RGS Counter 56.1 Stmt. ¶ 13.) In order to proceed with the Second Offering, RGS needed to obtain waivers of the 90-Day Prohibition by complying with the 50.1% Requirement. (Pl. 56.1 Stmt. ¶ 14; RGS Counter 56.1 Stmt. ¶ 14; RGS 56.1 Stmt., ECF No. 62, ¶ 43; Pl. Counter 56.1 Stmt., ECF No. 69, ¶ 43.)

Waiver letters were executed by seven investors and received by RGS on February 7 and 8, 2017.[2] (Pl. 56.1 Stmt. ¶ 23; RGS Counter 56.1 Stmt. ¶ 23; Hoffner Decl. Ex. M, ECF No. 56-14;

---

[2] RGS also claims to have received an email waiver on behalf of another one of its investors, Heights Capital Management, Inc. ("Heights Capital"), on February 8, 2018; Heights Capital's agent, CVI Investments, provided the waiver. (Krysa Decl. Ex. Y, ECF No. 61-26; RGS Counter 56.1 Stmt. ¶ 23; Hoffner Decl. Ex. Q at 5.)

Hoffner Decl. Ex. Q, ECF No. 56-18, at 5.) These seven investors participated in the Second Offering, which closed on February 8, 2018.[3] (Hoffner Decl. Ex. Q, at 12-13; Pl. 56.1 Stmt. ¶ 36; RGS Counter 56.1 Stmt. ¶ 36.) Alpha Capital never was offered the opportunity to participate in the Second Offering. (Pl. 56.1 Stmt. ¶ 22; RGS Counter 56.1 Stmt. ¶ 22.)

### PROCEDURAL HISTORY

Plaintiff filed its Complaint in this case on February 16, 2017, principally asserting securities fraud claims in connection with the Second Offering. (Compl., ECF No. 1.) Plaintiff filed an Amended Complaint on May 12, 2017, asserting the following claims: Count I against RGS for breach of the SPA; Count II against RGS for rescission based upon breach of the SPA; Count III against Roth Capital for tortious interference with the SPA; and Count IV against Roth Capital for conspiring to induce breach of the SPA. (Am. Compl. ¶¶ 38-85.) After written discovery and depositions, the each of the parties filed the motions for summary judgment addressed to the Amended Complaint that are presently before the Court.

Oral argument on the summary judgment motions was held on April 25, 2018.

### DISCUSSION

I.    **Legal Standard For Summary Judgment**

Under the well-established summary judgment standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

---

[3] If both the shares of RGS common stock issuable to the First Offering investors pursuant to the SPA and the shares of RGS common stock issuable upon exercise of the Series L Warrants are including in calculating the 50.1% Interest Requirement, the seven investors that provided RGS with waiver letters met the 50.1% Interest Requirement. (Pl. 56.1 Stmt. ¶ 29; RGS Counter 56.1 Stmt. ¶ 29.) If the waiver from Heights Capital is counted, RGS met the 50.1% Requirement even if the Series L Warrant Shares were excluded. (*See* RGS 56.1 Stmt., ECF No., 62, ¶¶ 78-79; Pl. Counter 56.1 Stmt., ECF No. 69, ¶¶ 78-79.)

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court first considers, in Section II below, the motions for summary judgment filed by Alpha Capital and RGS in tandem since they both address Counts I and II of the Amended Complaint, which are based upon a breach of contract theory and implicate the same provisions of the SPA, *i.e.*, Sections 4.13(a), 4.14 and 5.5. Then, in Section III, the Court considers Roth Capital's motion for summary judgment.

## II.     Motions By Alpha Capital And RGS For Summary Judgment

### A.     Legal Standard For Breach Of Contract Claims

Under New York law,[4] the elements of a claim for breach of contract are: "[1] the existence of a contract, [2] the plaintiff's performance thereunder, [3] the defendant's breach thereof, and [4] resulting damages." *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010) (citation omitted). When interpreting a contract, "[t]he objective . . . is to determine what is the intention of the parties as derived from the language employed[.]" *Lopez v. Fernandito's Antique, Ltd.*, 305 A.D.2d 218, 219 (1st Dep't 2003) (internal quotation marks omitted) (quoting *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 171-72 (1973)). This requires consideration of "not merely literal language, but whatever may be reasonably

---

[4] The SPA provides in Section 5.9 that it is governed by New York law. (Hoffner Decl. Ex. C, ECF No. 56-4, at 30 ("All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of laws thereof.").)

implied therefrom . . . ." *Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 555 (1982) (citations omitted). When an agreement is "clear and unambiguous on its face" then that agreement "must be enforced according to the plain meaning of its terms." *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137, 140 (1st Dep't 2008) (internal quotation marks omitted) (citing *Greenfield v. Phillies Records*, 98 N.Y.2d 562, 569 (2002)).

"Whether a contractual term is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the four corners of the contract to discern its meaning and not to extrinsic sources." *Id.* at 141 (citing *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)). However, "[w]hen the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment." *Van Etten Oil Co., Inc. v. Aero Star Petroleum, Inc.*, 131 A.D.3d 740, 741 (3d Dep't 2015) (internal quotation marks omitted) (quoting *Leon v. Lukash*, 121 A.D.2d 693, 694 (2d Dep't 1986)).

"The courts should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms." *Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*, 74 A.D.3d 516, 518 (1st Dep't 2010) (citation omitted). Similarly, "[a] contract should not be interpreted to produce a result that is absurd." *Lipper Holdings v. Trident Holdings*, 1 A.D.3d 170, 171 (1st Dep't 2003) (citation omitted).

**B.      RGS Did Not Breach The 50.1 % Requirement**

Alpha Capital alleges that RGS breached the 50.1% Requirement, and therefore Sections 4.13(a) and 5.5 of the SPA, by conducting the Second Offering without obtaining the requisite consent of 50.1 percent of the purchasers from the First Offering to waive the 90-Day Provision

contained in Section 4.13(a). (Am. Compl. ¶¶ 38-46.) Section 4.13(a) of the SPA provides that RGS could not issue securities for a period of 90 days following the close of the First Offering. (Hoffner Decl. Ex. C, ECF No. 56-3, at 26.) However, Section 5.5 provides that the provisions of the SPA could be waived by a "written instrument" signed by RGS and purchasers in the First Offering which purchased "at least 50.1% in interest of the Shares based on the initial Subscription Amounts hereunder." (*Id*. at 29.)

RGS asserts that it obtained formal waiver letters from purchasers in the First Offering that represented more than 50.1% of the funds invested in that offering (including both Shares of common stock and Series L Warrant Shares), such that Section 4.13(a) was properly waived and no breach occurred. (RGS Mem. of Law in Supp., ECF No. 60 at 9.) By contrast, Plaintiff asserts that the calculation of the 50.1% Requirement under the SPA could not properly include the Series L Warrant Shares, such that there was a breach of Section 4.13(a). (Pl. Mem. of Law in Supp., ECF No. 58, at 17-18.) Thus, the issue before the Court is whether the Series L Warrant Shares should be included in the calculation of the 50.1% Requirement.

After a careful review of the SPA provisions, construing the plain language used by the parties, and harmonizing the terms of the SPA, the Court concludes that Series L Warrant Shares should be included in the calculation of the 50.1% Requirement. Section 5.5 provides that no provision of the SPA can be waived except by "at least 50.1% in interest of the Shares based on the initial Subscription Amounts." (Hoffner Decl. Ex. C, ECF No. 56-3, at 29.) The term "Subscription Amount" is defined as "the aggregate amount to be paid for the Shares and Warrants purchased hereunder as specified below such Purchaser's name on the signature page of this Agreement and next to the heading 'Subscription Amount' . . . ." (*Id*. at 4.) The signature

page of the SPA has two separate lines below the purchaser's name, each of which uses the term "Subscription Amount," namely, "Subscription Amount for Shares" and "Subscription Amount for Series L Warrants." (Hoffner Decl., ECF No. 56-4, at 6.) Thus, by definition, the Subscription Amounts referred to in Section 5.5 include the Series L Warrants.

Plaintiff points to the fact that the terms "Shares" and "Warrant Shares" are separately defined in the SPA to suggest that they must be different from one another. (Pl. Mem. in Supp. at 16-17.) The Court finds, based upon the plain language of the SPA, that the term "Warrant Shares" is a subset of the broader term "Shares." (RGS Mem. in Supp. at 8-9.) "Warrant Shares" is defined as "the shares of Common Stock issuable upon the exercise of the Warrants." (Hoffner Decl. Ex. C, ECF No. 56-3, at 5.) "Shares" is more broadly defined as "the shares of Common Stock issuable to each Purchaser pursuant to this Agreement." (*Id*. at 4.) As reflected on the signature page of the SPA, the shares of common stock issuable to each purchaser includes the Subscription Amounts for Series L Warrants. (Hoffner Decl. Ex. C, ECF No. 56-4, at 6.)[5]

Thus, no breach of the 50.1% Requirement has occurred, and summary judgment is GRANTED to RGS with respect to those parts of Counts I and II that are based on a breach of that provision.

---

[5] Because the Court finds that there has been no breach of the 50.1% Requirement as set forth above, the Court need not reach the alternative RGS argument that, even if Series L Warrant Shares are not included to meet the 50.1% Requirement, RGS met the requirement since it received an email waiver from one of its investors, Heights Capital, on February 8, 2018.

**C.** **Genuine Issues of Material Fact Exist As To Whether RGS Breached The Equal Treatment And Disproportionate Impact Provisions, And Any Damages That Flow From Such Breaches**

**1.** **The Equal Treatment Provision**

Alpha Capital alleges that RGS breached Section 4.14 (the Equal Treatment Provision) of the SPA in connection with the Second Offering by offering consideration to purchasers in exchange for the waivers of the 90-Day Provision. (Am. Compl. ¶¶ 38-46.) Section 4.14 provides in pertinent part that no consideration "shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of the Transaction Documents unless the same consideration is also offered to all of the parties to such Transaction Documents." (Hoffner Decl. Ex. C, ECF No. 56-3, at 28.)

Alpha Capital asserts that, by excluding it from the transaction, and offering only certain investors the opportunity to participate in the Second Offering, RGS breached the Equal Treatment Provision. (Pl. Mem. in Supp. at 14.) By contrast, RGS asserts that the ability to participate in the Second Offering does not constitute consideration paid by RGS, and was not a quid pro quo for a waiver. (RGS Mem. in Supp. at 17.) RGS states: "*It is not clear* that Alpha [Capital] would have benefitted in any way by being allowed to participate in the Second Offering." (*Id*. at 18 (emphasis added).)

The Court finds that genuine issues of material fact exist as to whether consideration was given in exchange for the waivers, in view of the fact that the seven investors that provided waiver letters were permitted the opportunity to participate, and in fact participated, in the Second Offering.

Under New York law, consideration is defined as "some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or

responsibility, given, suffered, or undertaken by the other." *Hamer v. Sidway*, 124 N.Y. 538, 545, 27 N.E. 256 (1892) (internal quotations omitted). Consequently, "[i]t is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him." *Anand v. Wilson*, 32 A.D.3d 808, 809, 821 N.Y.S.2d 130 (2d Dep't 2006); s*ee also Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 464, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982) (noting consideration "consists of either a benefit to the promisor or a detriment to the promise"). Moreover, it is not the province of the courts to delve into the adequacy or value of the consideration. *See Caisse Nationale De Credit Agricole– CNCA v. Valcorp, Inc.*, 28 F.3d 259, 265 (2d Cir. 1994) ("It is well established that the slightest consideration is sufficient to support the most onerous obligation and that the courts are not to inquire into the adequacy of consideration.") (internal quotation omitted).

*Calico Cottage, Inc. v. TNB, Inc.*, No. 11–CV–0336 (DLI) (MDG), 2014 WL 4828774, at *4 (E.D.N.Y. Sept. 29, 2014). The role of this Court is not to determine whether it is "clear" if Alpha Capital would have benefited from the Second Offering. The question is whether consideration was offered or paid to the other seven investors that signed waivers, which consideration was not offered to Alpha Capital. The record evidence shows that seven of fifteen investors in the First Offering were able to invest in the Second Offering and that those investors consented to a waiver. In the circumstances, it is reasonable to infer, absent other evidence, that the right to participate in the Second Offering was offered to the seven investors, essentially in exchange for their waiver. The Court thus concludes that the issue of consideration must be resolved at trial, and those parts of both Plaintiff's and RGS's motions for summary judgment that are based on breach of the Equal Treatment Provision are DENIED.

Closely related to the Equal Treatment Provision, which requires that all parties to the SPA be treated equally, are the Disproportionate Impact Provisions, which require that a Purchaser (or group of Purchasers) not suffer a disproptionate impact from any waiver of the

SPA's provisions. As set forth below, the Court also finds that the issue of breach of the Disproportionate Impact Provisions cannot be resolved on summary judgment.

### 2.      The Disproportionate Impact Provisions

In RGS's motion for summary judgment, it argues that it did not breach the Disproportionate Impact Provisions. (RGS Mem. in Supp. at 15-16.) Alpha Capital[6] alleges in its Amended Complaint that RGS breached the Disproportionate Impact Provisions (and therefore Sections 4.13(a) and 5.5 of the SPA) by conducting the Second Offering without obtaining the consent of the purchasers from the First Offering, which did not participate in the Second Offering, to waive the 90-Day Provision contained in Section 4.13(a), thereby disproportionately affecting the rights of the non-participating purchasers, including Alpha Capital. (Am. Compl. ¶¶ 38-46.) During oral argument, RGS asserted there was no disproportionate impact since Alpha Capital could have purchased shares of RGS common stock on the open market at a price on the date of the Second Offering that was below the price paid for such shares in the Second Offering. (*See* RGS 56.1 Stmt. ¶ 88.) Alpha Capital responded at oral argument that it was deprived of the opportunity to obtain, in addition to RGS common stock, RGS warrants that were part of the Second Offering. The Court finds on the present record that there are factual issues regarding whether the waiver of the 90-Day Prohibition itself had any impact on Alpha Capital, and whether any impact on Alpha Capital was disproportionate to the participating investors. Thus, those parts of RGS's motion for summary judgment that are based on breach of the Disproportionate Impact Provisions are DENIED.

---

[6] Alpha Capital did not move for summary judgment with respect to the Disproportionate Impact Provisions, but argues that RSG is not entitled to summary judgment on the issue of breach of these provisions.

### 3. **Damages**

RGS also argues that Alpha Capital cannot prove any damages from breach of the SPA. (RGS Mem. in Supp. at 18-24.) In response, Alpha Capital states that there are genuine issues of material fact as to damages and, at the very least, it is entitled to nominal damages. (Pl. Mem. of Law in Opp., ECF No. 66, at 9-15.) Although based on the current record the Court is skeptical as to the quantum of damages that Alpha Capital can prove at trial, it is true that Alpha Capital at the very least is entitled to nominal damages. *See Raymond Weil, S.A. v. Theron*, 585 F. Supp. 2d 473, 488 (S.D.N.Y. 2008) ("It is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of the loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any." (quoting *Medinol Ltd. v. Boston Sci. Corp.*, 346 F.Supp.2d 575, 599 (S.D.N.Y. 2004)). In any event, the Court finds that it is inappropriate to decide damages issues at the summary judgment phase of this case. *MTV Networks v. NVE Pharm.*, No. 01-CV-1699 (DC), 2002 WL 1203853, *6 (S.D.N.Y. June 3, 2002) (denying summary judgment on issue of damages in breach of contract action, even when "the amount of damages is unclear at this point," finding that "the assessment of damages requires factfinding that can only take place at trial.").

## III.   **Roth Capital's Motion For Summary Judgment Is Granted**

Plaintiff asserts two claims against Roth Capital: (1) a claim for tortious interference with contract (Count III); and (2) a claim for conspiracy to breach contract (Count IV). The Court GRANTS summary judgment in favor of Roth Capital on both claims.

### A. Count III Against Roth Capital Is Dismissed

Under New York law, there are five elements to a tortious interference with contract claim: (1) the existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting to plaintiff therefrom. *CAC Grp. Inc. v. Maxim Grp. LLC*, 523 F. App'x. 802, 806 (2d Cir. 2013).

There is no evidence in the record that Roth Capital intentionally procured RGS's alleged breach of the Equal Treatment and Disparate Impact Provisions of the SPA without justification.[7] "[I]t is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead, the evidence must show that the defendant's objective was to procure such a breach." *Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, No. 14-CV-7529 (RJS), 2016 WL 5414979, at *5 (S.D.N.Y. Mar. 18, 2016) (citation omitted). Since there is no evidence that Roth Capital's objective was to procure a breach of those provisions of the SPA by RGS, summary judgment is GRANTED to Roth Capital as to Count III of the Amended Complaint.

### B. Count IV Against Roth Capital Is Dismissed

In Count IV, Plaintiff alleges that Roth Capital conspired to induce RGS's breach of the SPA. In order to survive summary judgment on a conspiracy claim, a plaintiff must be able to satisfy the elements of the underlying "independent actionable tort and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the

---

[7] Since the Court has dismissed Plaintiff's claim for breach of the 50.1% Requirement, the Court need not discuss the evidence proffered by Plaintiff of any breach of such requirement.

agreement; (3) a party's intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 479 (S.D.N.Y. 2001). Here, there is no actionable tort and, in any event, there is no evidence in the record of a corrupt agreement.[8] In that regard, the Court notes that Plaintiff decided not to even take the deposition of a Roth Capital witness to seek to establish its conspiracy claim. (Roth Capital Mem. in Supp., ECF No. 64, at 3.) Accordingly, Count IV of the Amended Complaint is dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment as to liability against RGS (ECF No. 55) is DENIED in its entirety. RGS's motion for summary judgment (ECF No. 59) is GRANTED IN PART and DENIED IN PART. Those portions of Counts I and II that allege a breach of the 50.1% Requirement are dismissed. Roth Capital's motion for summary judgment (ECF No. 63) is GRANTED in its entirety, and Counts III and IV of the Amended Complaint are dismissed.

Within 45 days of the date of this Opinion and Order, Plaintiff and RGS shall submit a Joint Pretrial Order[9] in advance of a trial to be held regarding the only remaining portions of Counts I and II of the Amended Complaint: the alleged breach by RGS of the Equal Treatment and Disproportionate Impact Provisions, and any damages that proximately flowed therefrom.

---

[8] Again, since Plaintiff's claim for breach of the 50.1% Requirement has been dismissed, the Court does not consider any evidence regarding purported efforts by Roth Capital to conspire to engage in such alleged breach.

[9] Alpha Capital and RGS shall follow the Court's Individual Practices regarding the content of the Joint Pretrial Order: http://nysd.uscourts.gov/cases/show.php?db=judge_info&id=1467

The Clerk of Court is directed to terminate Defendant Roth Capital Partners, LLC as a party in this case, and to amend the caption in this case to read as follows: Alpha Capital Anstalt v. Real Goods Solar, Inc.

Dated: New York, New York
        April 25, 2018

                                        **SO ORDERED**.

                                        _____
                                        **STEWART D. AARON**
                                        **United States Magistrate Judge**